IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CLEVELAND COMMUNICATIONS, INC. | Case No. 1:23-cv-1561 |
| Plaintiff, | JUDGE CHARLES E. FLEMING |
| v. | MAGISTRATE JUDGE JONATHAN D. GREENBERG |
| LORAIN COUNTY BOARD OF COMMISSIONERS, *et al.*, | |
| DEFENDANTS. | |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Cleveland Communications, Inc. ("CCI") moves the Court for a temporary restraining order and preliminary injunction enjoining Defendants Lorain County Board of Commissioners (the "Board"), David J. Moore, Jeffrey Riddell, and Jeffrey Armbruster[1] from terminating CCI's lease on a tower at 225 Burns Road, Elyria, Ohio and from further interfering with CCI's operation of its radio system.

Nine Lorain County municipalities involving twenty-two agencies rely on CCI for emergency radio communications.  Specific instances include the recent response to the ambush shooting of three police officers, the rescue of a child caught in a burning home, and an ambulance dispatched to a victim bleeding to death.  CCI is the overwhelming choice of first responders in Lorain County and the answer to the unreliable radio communications that threatened public safety in Lorain County for too long.

---

[1] Individual defendants will be identified by their last name.

1

But notwithstanding the overwhelming support of first responders, the Defendants in this action – as detailed in this case – have gone to extraordinary lengths to shut down CCI in favor of a competing radio system. While two of the defendants are county commissioners with a right to vote against CCI, this case arises because they and their confederates have crossed the line into unlawful conduct, and even racketeering and unconstitutional activity, to control Lorain County and to exclude CCI in contravention of the public interest. Once CCI exercised its constitutional right to file this case, Defendants further retaliated against CCI, justifying their misconduct by blaming CCI for filing this case.

On August 12, 2025, the Board terminated CCI's lease to use a publicly owned tower essential to maintaining its independent radio system.[2] The intended result is to shut down CCI. No other explanation makes sense because the tower can be used simultaneously by multiple users, as CCI and Defendants' chosen radio vendor have done without incident for some four years. Crediting their own words, the motive for the termination is in substantial part to retaliate against CCI for exercising its constitutional right to file this lawsuit, a violation of 42 U.S.C. § 1983.

CCI now seeks injunctive relief to preserve the status quo during the pendency of this case. In the alternative, CCI seeks an affirmative injunctive ordering the Board to allow CCI the use of the tower at Lorain County Community College during the pendency of this case.

## INCORPORATED MEMORANDUM OF LAW

### A. Factual Background

The facts underlying this lawsuit are set forth in the Second Amended Complaint ("SAC"), pages 8-27, and further verified in the affidavit of Alan L. Close. (Affidavit of Alan L. Close

---

[2] This "Five Cities Radio System" is a growing alternative to the county-wide radio system for which CCI originally held the contract to build, but Defendants later terminated as detailed in the Second Amended Complaint.

("Close Aff."), attached as **Exhibit A**).  The additional factual circumstances necessitating injunctive relief follow.

On August 11, 2025, one day before the Lorain County Board of Commissioners meeting, the Board released an agenda announcing their intent to terminate the lease agreement for space on a tower at 225 Burns Road, Elyria (the "Burns Road Tower").  (Agenda, Lorain County Board of Commissioners, Item #10, attached as **Exhibit B**.)  Despite Defendants Moore and Riddell each claiming CCI knew about the termination for a year prior, no one at CCI received any notice of intent to terminate or not to renew the Tower Lease before August 11, 2025.  (Close Aff. at ¶ 12.)

President of the Lorain County Chiefs of Police Association, Shefield Police Chief William Visalden, raised at the August 12 Board meeting the "serious concern" for public safety.  (Hannah Drown, *"Left in the dark": First Responders sound alarm as Lorain County ends Cleveland Communications radio lease*, CLEVELAND.COM, Aug. 19, 2025, at 4–5, attached as **Exhibit C**. *See* Aaron Knapp, *The Contradictor-in-Chief: Dave Moore's 8/15 Performance and the Unraveling of the CCI Sabotage Narrative*, LORAIN COUNTY POLITICS UNPLUGGED, Aug. 20, 2025, attached as **Exhibit D**.)  "I understand, and we understand, that you guys are in control of that, however, we would like to have some conversations."  (*Id.*)  In a display of callousness, Defendant Riddell did not deny the move would interrupt service to certain communities but argued the 60-day notice meant the interruption would not be immediate:  "At this point we are not interrupting the service, but the vendor knew this day was coming[3] and he had an obligation to his customers to provide a plan B, so we assumed that he's doing that."  (*Id.* at 6.)

---

[3]  As explained above and below, CCI did not have prior notice of the Defendants' intent to termination the lease.

3

As Defendants intend, this termination threatens to silence a radio system that began some six years ago. (Close Aff. at ¶¶ 5, 27–28.) It was initially called the "Five Cities Radio System" for the five communities in the Northeast corner of Lorain County which sought on their own initiative to upgrade their emergency radio communications with the assistance of CCI. (Close Aff. at ¶ 5.) As a critical component of the System, CCI installed its repeaters on the Burns Road Tower in 2021 to maximize quality coverage. (Close Aff.at ¶¶ 5–6.) With the success of the operational System, the "Five Cities Radio System" has expanded to include nine municipalities and twenty-two agencies, consisting of law-enforcement, fire, emergency services, and schools. (Close Aff.at ¶¶ 5, 9.)

CCI's right to use the Burns Road Tower was memorialized in a lease entered on October 20, 2021, renewable automatically every two years. (Close Aff. at ¶ 6; Exhibit E.) On December 21, 2022, by a 2-0 vote,[4] the Board, still comprised of a different mix of members than now, also selected CCI for a county-wide radio system, memorialized in an Agreement to Provide Goods and Services to Lorain County, Ohio on December 21, 2022 (the "Agreement"). (Close Aff. at ¶ 7.)

When the calendar turned to 2023, however, the Defendants gained majority power over the Board and steered the county-wide system to Motorola. (Close Aff. at ¶ 8.) With a 2-1 vote, Defendants Riddel and Moore revoked CCI's valid contract and withdrew its federal funding despite widespread backlash from the counties' first responders. (Close Aff. at ¶ 8; SAC at ¶ 108.)

---

[4] Defendant Moore was a member of the Board at the time but did not attend the meeting or vote.

4

In turn, CCI exercised its First Amendment right "to petition the Government for a redress of grievances" by filing this federal action on August 10, 2023.[5] (Close Aff. at ¶ 10.) The Board later approved a more expensive deal with Motorola for a county-wide radio system. (Close Aff. at ¶ 22.) Riddell and Moore carried the vote in favor, 2-1, without allowing public comment. (Close Aff. at ¶¶ 4, 9 & 17; SAC at ¶ 128.)

But Defendants did not call it "mission accomplished." With first responders and taxpayers firmly against Moore and Riddell's revocation of CCI's county-wide contract, Defendants engaged in a pattern of retaliation against CCI and in furtherance of their corrupt conspiracy. (Close Aff. at ¶ 4; SAC at ¶¶ 123–128.) Defendant Jeffrey Armbruster prohibited County employees and others in Lorain County from speaking to any employee of CCI expressly citing this lawsuit. (Close Aff. at ¶ 4; SAC at ¶ 126.) Defendant Armbruster also blocked County first responders from purchasing products from CCI because of this lawsuit. (Close Aff. at ¶ 4; SAC at ¶ 126.) Defendant Moore used Board letterhead to issue a letter denigrating CCI and calling it a "radio storefront and not a communications network provider." (Moore Letter, attached as **Exhibit F**.) Of course, CCI is a communications network provider, but Defendants' latest retaliation aims at making Moore's statement true. Because CCI still operated and maintained the independent Five Cities Radio System, the effort to exclude CCI from doing business in Lorain County was and remains a significant problem pled in detail in the SAC.

Now, Defendants have upped the retaliation by terminating the Tower Lease. (Close Aff. at ¶¶ 13–20.) Moore joyously tied the termination to the lawsuit: "I'm also happy that the vender [CCI] . . . filed RICO in Federal Court and has done nothing for two and a half years. No discovery.

---

[5] Prior to this action, CCI filed a state court administrative appeal and breach of contract action, which it voluntarily dismissed and refiled in this Court after the scale of the Defendants' misconduct became apparent.

5

No depositions.  *Nothing*.  They were hoping I'd lose but guess what happened." (Excerpts of Lorain County Board of Commissioners Meetings, attached as **Exhibit G**.)

While Defendants publicly pronounce a willingness to extend the lease for a smooth transition, the Defendants strike a different tone outside the public's view. Defendant Riddell exposed the retaliatory motive for the termination in substance: "They've been suing us for two years, why do I owe them any favors." (Close Aff. at ¶ 16.)

Furthermore, after CCI filed this lawsuit, Defendants added an addendum to the contract with Motorola requiring the Board to transfer the Burns Road Tower to MARCS[6] unencumbered by CCI's Tower Lease.  (Close Aff. at ¶ 17.)  Twenty-one other agencies are licensed at the site and their use of the Burns Road Tower will not be impacted.  (Close Aff. at ¶ 19.)   CCI has also shared the Burns Road Tower without incident for four years with all users, including MARCS. Only CCI was terminated and told to leave.  (Close Aff. at ¶ 21.)  Leaving CCI's equipment on the Burns Road Tower and continuing to collect lease payments imposes no burden on the County. (Close Aff. at ¶ 21.)

Since notification of the Tower Lease, CCI has looked for an alternative location to install its equipment but has not located one.  (Close Aff. at ¶ 24.)  For example, CCI identified a tower at the Lorain County Community College that would provide lesser but still suitable coverage. (Close Aff. at ¶ 24.)  However, six of the Lorain County Community College's nine Board of Trustees members are appointed by the Defendant Board.  (Press Release, *Lee Armbruster Appointed as New Member of LCCC District Board of Trustees*, LORAIN COUNTY COMMUNITY COLLEGE NEWS, June 26, 2025, at 1, attached as **Exhibit H**.)  In fact, just over six weeks before

---

[6]  MARCS is an acronym for Multi-Agency Radio Communication System and is run by the Ohio Department of Administrative Services.  It uses only Motorola equipment and is aligned closely with that private concern.

6

the Defendants announced the Tower Lease termination, Defendant Armbruster's wife Lee Armbruster was sworn onto the college's Board of Trustees. (*Id.*) CCI contacted the college about potential access to the college's tower but was told by the college's Vice President that "there are political considerations to take into account." (Close Aff. at ¶ 24.)

With additional time, CCI may be able to secure another location, but Defendants will not agree to give additional time notwithstanding the disruption to first responders who use "The Five Cities Radio System" and the threat to public safety. (Close Aff. at ¶¶ 26–28.)

Loss of the Tower Lease will inhibit CCI's ability to continue its operation of the radio system and will seriously endanger the lives of first responders and the communities that rely on them. (Close Aff. at ¶¶ 27–28.) In particular, the Burns Road Tower's height and location provides Lorain County communities with critical in-building coverage for first responders. (Close Aff. at ¶ 18.) First responders have relied on the in-building coverage provided by the Burns Road Tower for four years. (Close Aff. at ¶ 18.)

B. **Law and Argument:  This Court Should Grant Injunctive Relief**

"The purpose of a preliminary injunction is merely to preserve the relative position positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *accord*, *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996) (a temporary restraining order "preserve(s) the status quo so that a reasonable resolution of a dispute may be had."). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, (1971)). *See also Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999) ("Federal courts are courts in law and in equity, and a court of equity has traditionally had

7

the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case."). A court's power includes enjoining a defendant from a continuing pattern of retaliation against the plaintiff. *See Gutierrez v. Mariscos El Puerto, Inc.*, Case No. 2:19-CV-1940, 2019 U.S. Dist. LEXIS 198917, *9–10 (D. Nev. Nov. 15, 2019) (granting restraining order that "enjoins defendants from retaliating against or terminating any plaintiff or any other employee of defendants").

In determining whether to order injunctive relief, this Court should consider four factors: "(1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of a preliminary injunction." *McNeilly v. Land*, 684 F. 3d 611, 615 (6th Cir. 2012). In considering these four factors, no one factor is dispositive. Courts balance these factors rather than applying them as "perquisites that must be satisfied." *Id.*; *See also, Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985).

### 1. *CCI Demonstrates a Strong Likelihood to Prevail on the Merits*

The first prong of the analysis only requires CCI to show a likelihood of success on one claim. *McQueary v. Conway*, 614 F. 3d 591, 603 (6th Cir. 2010). The detailed allegations in the SAC demonstrate a likelihood of success on the merits. Amongst other allegations, the SAC alleges: "In furtherance of their scheme to exclude CCI from business within Lorain County, one or more defendants have also sought to unlawfully prevent CCI from providing equipment and services to first responders in Lorain County, and to unlawfully retaliate against CCI from exercising its constitutional right to petition this Court." (SAC. at ¶ 4.) Specifically, "Defendants have worked to exclude CCI from servicing and expanding the range and number of users on the 'Five Cities Radio System.'" (*Id.* at ¶ 123.)

8

The individual defendants have acted in concert to interfere with the Five Cities Radio System. (*Id.* at ¶ 125. *See also id.* at ¶ 35 ("To stop CCI, they focused on the need for the 'Five Cities Radio System' to install repeaters to increase the range of radio communications within Lorain County."), ¶ 36 (detailing intimidation of Hung to try to control who is allowed on the Burns Road Tower), ¶ 39 ("Acting in concert with defendants Moore and Armbruster, co-conspirator Williams pressured . . . Williamson to influence Hung not to support CCI."), ¶ 136 ("Moore and Armbruster have participated in the operation and management of Lorain County through a pattern of racketeering activity" and in furtherance of the scheme, Armbruster has supervised others in conduct including "retaliating against CCI for filing this lawsuit."). As part of its ultimate relief, CCI prayed for an order for "injunctive relief to prevent the continuing retaliation against CCI and the unlawful interference with its continuing efforts to service and supply 'the Five Cities Radio System' and other first responders in Lorain County, Ohio." (*Id*. at p. 44, ¶ H.)

CCI has plead this course of retaliation violates 42 U.S.C § 1983, and in addition, the termination of the Tower Lease is a further unvarnished act in of retaliation furthering the purposes of the RICO conspirators. *DeGuelle v. Camilli*, 664 F.3d 192, 201–202 (2011) (explaining that 18 U.S.C. § 1513(e) & (f) protect witnesses or victims from retaliation against their employment or livelihood and serves as a RICO predicate).

"A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396-97 (6th Cir. 1999) (en banc).

9

### *a. This lawsuit is a First Amendment protected activity addressing a matter of public concern.*

As to the first element, CCI engaged in protected activity because "[t]he filing of a lawsuit carries significant constitutional protections, implicating the First Amendment right to petition the government for redress of grievances, and the right of access to courts." *R.S.W.W, Inc. v. City of Keego Harbor*, 397 F. 3d 427, 440 (6th Cir. 2005); *accord*, *Thaddeus-X*, 175 F.3d at 386. CCI was and is engaged in protected First Amendment conduct on a matter of public concern, having petitioned this Court to abate Defendants' corrupt and unlawful activity against CCI and the public interest. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 397 (2011) ("Litigation on matters of public concern may facilitate the informed public participation that is a cornerstone of democratic society.").

Following CCI's institution of this suit, CCI amended its Complaint to seek relief from Defendants' pattern of retaliation in furtherance of their corrupt enterprise and aimed at interfering with CCI's "Five Cities Radio System." Defendants' recent termination of the Tower Lease constitutes a significant escalation.

### b. *The Defendants' Tower Lease termination is an adverse action.*

As to the second element, the Defendants took adverse action against CCI by terminating the Tower Lease. Because the termination is calculated to shut down CCI's independent "Five Cities Radio System" (if it cannot find an alternative tower), the action is sufficient to deter a similarly situated person from exercising their right to seek redress in the courts going forward. *See Thaddeus-X*, 175 F.3d at 396.

Defendants will no doubt emphasize their right to terminate the Tower Lease without cause on sixty days' notice. But "[i]t is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial

part by a desire to punish an individual for exercise of a constitutional right." *Id.* at 386 (citing *Board of County Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996) (nonrenewal of government contract in retaliation for exercise of free speech is actionable)). Even where a state actor has a contractual right to terminate a contract, if the state actor chooses to exercise that right because the plaintiff engaged in constitutionally protected activity, that termination violates federal constitutional law. *Umbehr*, 518 U.S. at 686. In other words, the contract allows the County not to renew or terminate the contract for any reason, but not an unconstitutional reason.

### c. Defendants terminated the Tower Lease to coerce CCI to drop this lawsuit.

Which brings us to the third element: the "causal connection" between the adverse action and the protected conduct, *i.e.*, the First Amendment right of access to the courts. As alleged in the SAC, the retaliation is unlawful because Defendants terminated CCI in substantial part for exercising its right of access to the Courts. Defendants' own statements support that they have retaliated against CCI repeatedly, including in terminating the Tower Lease, for exercising this First Amendment right.

Riddell tied the termination to the filing of the lawsuit. (Close Aff. at ¶ 16.) While defending the termination of the Tower Lease at the August 15 meeting, Moore immediately referenced the fact that CCI had been suing the Board for two years. Concluding an 8-minute monologue, he further mocked this case: "I'm also happy that the vendor [CCI]… saw that we were winning in state court dismissed their lawsuit and filed RICO in Federal Court and has done nothing for two and a half years. No discovery. No depositions. *Nothing*. They were hoping I'd lose but guess what happened." (Exhibit E at 3.)

The intent of the termination is to injure CCI and send a message to anyone who might seek redress in Court. *Williams v. Mitchell*, 122 F.4th 85, (4th Cir. 2024) (finding that a causal connection exists when the government conduct is the type that "would chill someone from

11

exercising their constitutional rights in the future; it does not matter that such attempted interference may have failed.").

> d. **The Board has no legitimate interest in terminating the Tower Lease and even if it did, that interest pales in comparison to the First Amendment and public safety interests at stake.**

In light of the foregoing showing, the Board must show by a preponderance of the evidence, in light of their knowledge, perceptions, and policies at the time of the termination, that the Board would have terminated the contract regardless of CCI's exercise of its First Amendment rights or that their legitimate interests outweigh the First Amendment interests or other public or safety interests at stake. *Umbher* 518 U.S. at 685 (citing *Mt. Healthy Bd. Of Ed. v. Doyle*, 429 U.S. 274 (1977). *See Pickering v. Bd. Of Education*, 391 U.S. 563, 573 (1968); *Mosholder v. Barnhardt*, 679 F.3d 443, 451–452 (6th Cir. 2012).

The Board cannot rebut CCI's showing that the termination is an act of retaliation for exercising rights of access to courts. Beyond the animus toward CCI, the only rationale given for terminating the Tower Lease during its meetings on August 12 and 15, 2025, was that the Defendants had signed a contract that required them to terminate CCI's lease. The logic is circular, though, and the legitimacy of the rationale is undercut by the publicly available policies of MARCS, which allow competitors to co-locate equipment on towers with MARCS. (Close Aff. at ¶ 19.) Moreover, CCI is the only entity excluded from the Tower—a compelling fact in proof of a retaliatory motive. Termination is further unnecessary for any legitimate purpose because CCI has co-existed on the Burns Road Tower with other users for some four years.

> 2. **CCI (and the Public) will Suffer Irreparable Harm**

The second factor is whether the plaintiff will suffer irreparable injury absent an injunction. "Harm is irreparable if it cannot be fully compensated by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "The loss of First

12

Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976). In fact, "[w]hen an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." *Rodriguez v. Providence Cmty. Corr.,* 155 F.Supp. 3d 758 (M.D. Tenn. Dec. 17, 2015) (quoting 11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. 1998)); *accord Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) ("[W]hen constitutional rights are threatened or impaired, irreparable injury is presumed.").

"The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer." *Michigan Coal*, 945 F.2d at 153; *Ohio ex. Rel Celebrezze v. Nuclear Regulatory Comm.*, 812 F.2d 288, 290 (6th Cir. 1987) (a stay may be granted with a high probability of success and some injury). Here, CCI submits that the likelihood of success on the retaliation claim is high enough that its demonstration of irreparable harm could be low and still justify the injunction CCI seeks. Yet, the harm CCI faces is equally significant.

The degradation of CCI's radio network is certain and will occur immediately upon ejecting CCI from the Tower absent time and the opportunity to find a substitute location. Lack of confidence in the situation itself threatens defections from the Five Cities Radio System and those users will never be regained. The reputational damage CCI will suffer will be irreparable. The Defendants' apparent aim is to put CCI out of business. *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995) ("The impending loss or financial ruin of [a] business constitutes irreparable injury."); *Tri-State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir. 1986) (threat to trade or business viability is irreparable harm).

Further, the Defendants have retaliated against CCI in the past and are likely to continue to take unjust actions against CCI in the future. *H.J. Inc. v. Northwestern Bell Telephone Co.*,

13

492 U.S. 229, 239 (1989) (finding that RICO statutes are designed to address continuing activity). With injunctive relief, this Court can end the continuing misconduct that only expands the issues in this case. CCI certainly seeks damages in this case, but damages alone cannot compensate CCI for the harm it will suffer if its network goes abruptly silent on October 19, 2025.

### 3. *Balance of Harms and Public Interest*

Here there is no harm to the Defendants or anyone else in temporarily restraining or enjoining the termination of the Tower Lease. CCI asks only that the Defendants maintain the status quo until CCI can move to a reasonable alternative location or for the pendency of this case, whichever is longer. CCI's equipment is already on the Burns Road Tower. The County will continue to receive CCI's lease payment. The only benefits the Defendants appear to receive from the Tower Lease termination are unlawful.

Even if CCI could only show limited irreparable harm to itself, the public safety concern is so high that it compels injunctive relief. If the termination goes into effect on October 19, 2025, the 22 agencies throughout Lorain County communities will have significantly degraded emergency radio coverage, without hyperbole, immediately putting lives at risk. *Middletown v. Conrail*, Case No. 92-3076. 1993 U.S. App. LEXIS 1395, at *2 (6th Cir. Jan. 21, 1993) (relying on the strong public interest in preventing death and injury in granting injunctive relief). While there is no unfair harm to the Defendants, the public interest is compelling. (*See generally*, Exhibits C & D.)

CCI is simply asking for more time to find a reasonable alternative to the Burns Road Tower. A move will take time—time the County is loath to provide CCI because its goals are illegitimate.

**REQUESTED RELIEF**

WHEREFORE, based upon the foregoing, CCI respectfully asks the Court to enjoin Defendants Lorain County Board of Commissioners, David J. Moore, Jeffrey Riddell, and Jeffrey Armbruster from terminating the Tower Lease or otherwise interfering with the "Five Cities" Radio System" during the pendency of this case.  In the alternative, CCI seeks an affirmative injunction compelling Defendants to allow CCI the use of the tower at the Lorain County Community College.

Respectfully submitted,

*/s/ Allen T. Carter*
Allen T. Carter (0085393)
Porter, Wright, Morris & Arthur LLP
41 South High Street
Columbus, Ohio  43215
Phone:  614.227.2000
Fax:  614.227.2100
Email:	acarter@porterwright.com

Edmund W. Searby  (0067455)
McDaniel M. Kelly (0097628)
Porter Wright Morris & Arthur LLP
950 Main Avenue, Suite 500
Cleveland, Ohio  44113-7201
Phone (Edmund):  216-443-2545
Phone (McDaniel):  216-443-2538
Fax:  216-443-9011
Email:	esearby@porterwright.com
	mkelly@porterwright.com

Dean DePiero (0063629)
DEPIERO LAW
5546 Pearl Road
Parma, Ohio 44129
Phone:  440-884-2400
Email:	DEPIEROLAW@gmail.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 25th day of August 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  A courtesy copy will also be sent via via courtesy email as follows:

    Ryan M. Gembala (0079431)
    Patrick M. Ward (0095420)
    Stephen M. Bosak, Jr. (0092443)
    5455 Detroit Road
    Sheffield Village, Ohio 44054
    Tel:  (440) 930-4001
    Fax:  (440) 934-7208
    Email: rgembala@gmpfirm.com
           pward@ gmpfirm.com
           sbosak@ gmpfirm.com

    *Attorney for Defendants*

                                          */s/ Allen T. Carter*
                                          One of the Attorneys for Plaintiff